# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLE JONES, | Case No.  1:19-cv-01049-SAB |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 26, 28, 30) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Nicole Jones ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

///

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and the matter has been assigned to the undersigned for all purposes.  (See ECF Nos. 15, 16, 17.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on February 10, 2016.  (AR 74.)  Plaintiff's applications were initially denied on June 7, 2016, and denied upon reconsideration on September 8, 2016.  (AR 87-90, 94-98.)  Plaintiff requested and received a hearing before Administrative Law Judge Joyce Frost-Wolf ("the ALJ").  Plaintiff appeared for a hearing on May 2, 2018.  (AR 29-.)  On September 4, 2018, the ALJ found that Plaintiff was not disabled.  (AR 14-24.)  The Appeals Council denied Plaintiff's request for review on June 5, 2019.  (AR 1-3.)

### A.    Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at the May 2, 2018 hearing.  (AR 35-52.)  At the hearing counsel recognized that the functional limitations were not set out as the ALJ would like to see, but argued that they do have an idea of the nature of her impairments as set out by the treating doctor, Dr. Stuart.  (AR 33-34.)  The ALJ stated that she did have a question about the treating source since there had not been a lot of recent treatment by Dr. Stuart looking at the records that were submitted and the majority of the treatment appeared to be in 2016.  (AR 34.)  Plaintiff stated that she last saw Dr. Stuart two months prior to the hearing.  (AR 34.)  The ALJ noted that she saw that but there were not a significant number of appointments during 2017 or 2018 and she wanted to make sure she was not missing anything.  (AR 34.)  Counsel responded, "The treatment does go back to 2015 and continues forward when you're talking about.  I don't know that you're going to see much change in her condition when you hear the testimony."  (AR 34.)

Plaintiff's date of birth is September 19, 1958.  (AR 35.)  She lives in a senior mobile home park with her husband.  (AR 35.)  She has to climb steps to access her home.  (AR 35.)  She has two dogs and a bird.  (AR 35.)

Plaintiff is 5 foot 6 inches tall and weighs 210 pounds.  (AR 47.)  Plaintiff graduated from high school.  (AR 35-36.)  She took a nine month course for computerized accounting at Fresno City more than ten years ago.  (AR 36.)  Plaintiff last worked as an office clerk at PR

Farms.  (AR 36.)  Plaintiff also worked for Aramark.  (AR 38.)  She was having trouble remembering things at her last job and one time caught her supervisor making fun of her.  (AR 47.)  The owner told her that if she could not remember things then she should put a post-it note on her forehead and that hurt.  (AR 47.)

Plaintiff cooks and does the laundry.  (AR 40.)  Her husband usually does the vacuuming and mopping because repetitive movement hurts her shoulder blades.  (AR 40, 49.)  She can do repetitive motion for ten minutes before she will start feeling it.  (AR 49.)  Plaintiff does several loads of laundry once a week.  (AR 41, 45.)  She does not do elaborate meals and it usually takes her about thirty minutes to prepare a meal.  (AR 41.)  Plaintiff only cooks dinner and her husband helps.  (AR 45.)  He is retired now so they help each other out.  (AR 45.)  Sometimes she needs his help to cook dinner and he does a lot of the cooking.  (AR 45.)  They take the dogs for a walk every night for about twenty to twenty five minutes.  (AR 41, 45.)  Plaintiff is able to walk for thirty minutes at the most.  (AR 45.)  When she gets home she will sit down for a half hour or so because her hip is hurting.  (AR 45.)

Plaintiff goes to bed around 11:00 and gets up around 8:30 or 9:00.  (AR 45.)  She wakes up about three to four times per night because she has to go to the bathroom or has pain.  (AR 49.)

Plaintiff is able to drive but does not like to because she has had three accidents in the last four years and is scared.  (AR 41.)  It has been several years since her last accident.  (AR 41.)  4

Plaintiff tries not to take medication for pain unless she cannot handle it anymore.  (AR 41.)  She uses creams and heating pads and will take Ibuprofen from time to time and if she has a muscle spasm she will take a muscle relaxer or pain pill.  (AR 41.)  She uses the creams and heating pads on and off.  (AR 42.)  She uses Ibuprofen weekly.  (AR 42.)  The other medication is just used if she has a spasm.  (AR 42.)  The muscle relaxers make her sleepy and she will not drive or anything when she is taking them.  (AR 42.)

The last spasm she had was pretty bad and she had to use a cane for a couple days and went to the doctor.  (AR 42.)  The spasm was in her lower back and she had previously gone to the emergency room with one of those pains before and they told her it was a muscle spasm.

1  (AR 50.)  The one she had in December was worse and it was really hard for her to walk.  (AR

2  50.)  Her doctor offered her a walker but she refused.  (AR 50.)  She told him she would just use

3  her cane and pain slowly subsided and went away in a couple of days.  (AR 50.)

4      Plaintiff changed from seeing Dr. Stuart to Central Valley Indian Health Clinic because

5  she did not have the same income and is on Medi-Cal.  (AR 43.)  She started going to "him" in

6  2015.[2]  (AR 43.)  She last saw Dr. Stuart two months ago.  (AR 43.)  He talked to her to see how

7  things were going and wrote the letter for her.  (AR 43.)

8      What Plaintiff does during the day varies.  (AR 43.)  Sometimes she will wake up and

9  have a headache or irritable bowel syndrome that will interfere with the day.  (AR 43.)  Plaintiff

10  was told that she has fibromyalgia.  (AR 44.)  Some days it is worse than others.  (AR 44.)  On a

11  day that it is bad, it is "[i]cky all over."  (AR 44.)  She will have more pain through her shoulder

12  blades and her hip.  (AR 44.)  The pain is always there but it seems worse when it is raining.

13  (AR 44.)  Sometimes the pain lasts all day and medication will alleviate some, but not all of the

14  pain.  (AR 44.)  Plaintiff will get up, but will nap here and there when it is bad.  (AR 44.)

15  Plaintiff tries not to nap, but if she is feeling bad, she will lay down.  (AR 44-45.)  She naps

16  maybe three or four times a week.  (AR 45.)  She will nap for two to three hours at the most on

17  and off.  (AR 45.)  Plaintiff has a bad day half the days of the month.  (AR 51.)  She is not sure

18  how long it has been that half of the days of the month are bad days.  (AR 51.)

19      Plaintiff gets stiff when she sits so she likes to get up and down.  (AR 51.)  She is able to

20  sit after she walks around for a while.  (AR 51.)  Plaintiff does not get on the computer.  (AR

21  51.)  She reads short stories, but can not read long books because she can not remember.  (AR

22  51.)  That has been happening for a long time.  (AR 51.)  Plaintiff's husband helps her remember

23  dates because she can not remember dates and names.  (AR 52.)  Sometimes he will ask her if

24  she has taken her medication.  (AR 52.)

25      Plaintiff's husband, Timothy Jones, testified at the hearing.  (AR 52-55.)  He has known

26  Plaintiff for thirty-seven and a half years.  (AR 53.)  Plaintiff seems to have gotten weaker and

27

28  [2] The record is unclear as to whether this is referring to Dr. Stuart or the doctor she sees at the Central Valley Indian Health Clinic.

cannot do very much.  (AR 53.)  He does most of the housework and everything.  (AR 53.)  If she vacuums or anything she starts to hurt and has to lay down for thirty minutes to an hour.  (AR 53.)  She is forgetting more.  (AR 53.)  He notices her forgetting conversations monthly.  (AR 54.)  He will have told her he did something and she will not remember.  (AR 54.)  Once a week or so he will have to remind her to take her medication.  (AR 54.)

She used to be able to ride in a car longer and do more physical things.  (AR 54-55.)  He does ninety-nine percent of the cooking and housework.  (AR 55.)  She does maybe one percent of the cooking.  (AR 55.)  She will get up for a while and then lie down a couple to three times per week.  (AR 55.)  She does not cry much anymore, but once in while he will wake up and she will be sitting by the side of the bed crying from pain.  (AR 55.)

Paul Ramirez, a vocational expert, also testified at the hearing.  (AR 56-59.)

**B.     Relevant Medical Record**

In June of 2013, Plaintiff was being treated for depression citing the stress of work and that she felt she was underpaid.[3]  (AR 516.)  She was diagnosed with depression and her medications were continued.  (AR 516.)

Plaintiff was seen on October 15, 2013, complaining of not feeling well, ringing in her ears and headaches.  (AR 498.)  Physical examination notes tenderness at extremes of rotation of the neck.  (AR 498.)  She was found to have an acute cervical strain.  (AR 498.)

The first indication in the record of her pain complaints is on March 25, 2014, and prior to that she denied any myalgias, joint swelling or arthralgias.  (AR 475, 478, 482, 486, 489.)  On March 25, 2014, Plaintiff was seen for depression and cited stress from work issues.  (AR 475.)  Plaintiff reported that she felt mentally capable of doing her job but was overwhelmed by the work load and had conflicts with her boss.  (AR 475.)  She was feeling diminished, denigrated, and was missing work.  (AR 475.)  She reported just the usual aches and pains and that she had been very forgetful.  (AR 475.)  Her husband had noted no major issues at home.  (AR 475.)  Psychiatric exam shows mental functioning was slow.  (AR 475.)  She was unable to do serial 7s

---

[3] The Court notes that Dr. Stuart's treatment notes go back to 2012 at which time she was diagnosed with depression. (AR 520.)

1  and backward spelling was slow.  (AR 475.)  Plaintiff was able to remember three objects.  (AR

2  475.)

3      On April 7, 2014, Plaintiff was seen again complaining of work stress.  (AR 468.)  She

4  reported that her mood had improved since she was off work and was going to be off for carpal

5  tunnel surgery.  (AR 468.)

6      On April 25, 2014, Plaintiff was seen requesting an injection for pain in her right hip.

7  (AR 462.)  The record notes that she had been off work for carpal tunnel and now for stress.

8  (AR 462.)  Her work situation was expected to improve.  (AR 462.)  Musculoskeletal

9  examination shows that Plaintiff was wearing a left wrist brace; reported tenderness at the right

10  lateral hip for years that was worse with prolonged walking, and she was very tender over the

11  right trochanter.  (AR 462.)  Plaintiff was diagnosed with anxiety and greater trochanteric

12  bursitis of the right hip.  (AR 462.)

13      On June 6, 2014, Plaintiff saw Dr. Stuart for a follow-up on the injection and reported

14  that her hip pain had not improved, she was constipated but had no diarrhea, and that she was

15  nervous about returning to work after her surgery.  (AR 598.)  Plaintiff had an unremarkable

16  examination and was diagnosed with hypertension and biliary colic.  (AR 599.)

17      Plaintiff was seen by Dr. Yamamoto on June 9, 2014, complaining of nausea and

18  abdominal pain.  (AR 594.)  Physical examination notes some tenderness in the upper right

19  quadrant of the abdomen but is otherwise unremarkable.  (AR 594.)  She was diagnosed with

20  nausea and abdominal pain and was to have an abdominal ultrasound.  (AR 595.)  Plaintiff had

21  an abdominal ultrasound on June 12, 2014 that found "Cholelithiasis.  No evidence of

22  cholecystitis, biliary obstruction, or obstructive uropathy.  (AR 592-593.)

23      Plaintiff returned to see Dr. Stuart on June 20, 2014 and reported that her new position

24  was less stressful and that she does have frequent nausea and belching.  (AR 589.)  Dr. Stuart

25  noted that the abdominal ultrasound revealed a 2.3 cm gallstone.  (AR 589.)  Examination was

26  unremarkable.  (AR 589.)  Plaintiff had a colonoscopy on December 8, 2014, that showed

27  diverticulosis in the entire examined colon and internal hemorrhoids.  (AR 580.)

28      Plaintiff saw Dr. Wenjing on January 14, 2015, complaining of bursitis in her right hip

1   that had been present for one to two weeks and that was recurrent and occurs intermittently.  (AR
2   340.)  Other than a tender lateral right hip, examination was unremarkable.  (AR 340.)  She was
3   diagnosed with trochanteric bursitis of right hip and was prescribed naproxen.  (AR 341.)
4   Physical therapy was offered, but Plaintiff declined.  (AR 341.)

5        Plaintiff had a qualified medical evaluation by Dr. Wilker on her workers compensation
6   claim on April 15, 2015.  (AR 368-375.)  She reported pain of 1 out of 10 in intensity.  (AR 368.)
7   She had undergone a carpal tunnel release in April 2014 that had significantly improved her pain.
8   (AR 368.)  She denied any depression or anxiety.  (AR 369.)  Examination notes strength of 5
9   bilaterally in the shoulder, elbow, wrist and finger.  (AR 374.)  Sensation was intact in all
10  dermatomes.  (AR 374.)  Hoffman, Romberg, and heel to toe were negative.  (AR 374.)
11  Reflexes were 2+ in biceps, triceps and brachioradialis and Tinel's and Phalen's signs were
12  negative.  (AR 374.)  Dr. Wilker found that Plaintiff was status post left carpal tunnel release
13  with significant improvement and she was released to return to work without any restrictions.
14  (AR 374.)

15       Plaintiff saw Dr. Stuart on April 20, 2020, reporting that she had more energy at work,
16  was sleeping better with the gabapentin, and was having loose stools when she ate the wrong
17  foods.  (AR 337.)  She denied any depression or anxiety.  (AR 337.)  Physical examination was
18  unremarkable and she was diagnosed with hypertension, fibromyalgia, and dizziness.  (AR 337-
19  338.)  She was to cut her amlodipine in half to see if her dizziness improves.  (AR 338.)

20       Plaintiff was seen by Dr. Leyba for a consultation in April 2015.  (AR 288.)  She reported
21  a long history dating back to 1992 when she had symptoms of polymyoarthralgia with fatigue
22  and lack of energy and was diagnosed with Lyme disease.  (AR 288.)  Several years later she
23  was diagnosed with fibromyalgia and treated with antidepressants and got better.  (AR 288.)  She
24  reported that she had stopped taking the medication and since then has not been taking any
25  medications at all.  (AR 288.)  She stated that she has gotten better but still has symptoms.  (AR
26  288.)  She complained of fatigue, lack of energy together with diffuse muscle and joint pain in
27  addition to concentration issues and cognitive disfunction and headaches.  (AR 288.)  She
28  reported mid to low back pain and occasional numbness and tingling in her hands.  (AR 288.)

1   She only takes Ibuprofen periodically.  (AR 288.)  She has had pain in her right hip and had an

2   injection without any benefit.  (AR 288.)  She denied any unusual rashes or hair fail, symptoms

3   of pleurisy, pericarditis or Raynaud's.  (AR 288.)

4          On examination, Plaintiff was well appearing, well-nourished, and in no distress.  (AR

5   289.)  She was able to get up to exam table without assistance.  (AR 289.)  There was no facial

6   rash or prominent lesions and hair had normal texture and distribution.  (AR 289.)  The neck was

7   supple with normal range of motion to flexion, extension, and lateral rotation.  (AR 289.)  There

8   was no lymphadenopathy, thyromegaly, parotitis, carotid bruit.  (AR 289.)  Examination of the

9   heart and lungs were unremarkable.  (AR 289.)

10         Back examination notes minor scoliosis in the lumbar region.  (AR 289.)  Straight leg

11  raising was negative and there was no tenderness over the SI joints.  (AR 289.)  No rashes were

12  noted.  (AR 289.)  There were no deformities, clubbing, cyanosis, synovitis, or edema to the

13  extremities and no tenderness to palpation.  (AR 289.)

14         Musculoskeletal examination notes normal symmetry, tone, strength and range of motion

15  with no effusions, instability or tenderness to palpation.  (AR 289.)  Neurologic examination and

16  sensation were normal.  (AR 289.)  Plaintiff's strength was 5/5 in upper and lower extremities

17  bilaterally.  (AR 289.)  DTRs were symmetric and normal and gait was within normal limits.

18  (AR 289)

19         Dr. Leyba found that Plaintiff's diagnosis based on her chronology of symptoms and lack

20  of deformities or signs of chronic inflammation is consistent with fibromyalgia syndrome.  (AR

21  289.)  "She has a constellation of symptoms to include polymyoarthralgia, fatigue, lack of

22  energy, brain fog in addition to difficulty with sleep."  (AR 289.)  Dr. Leyba noted that she did

23  have a remote diagnosis of Lyme disease but he did not see any signs to suggest that her

24  symptoms were due to this.  (AR 289.)  She has never seen any rash or "bulls-eye" rash and

25  additional testing would be to check for this.  (AR 290.)

26         Plaintiff had a follow-up with Dr. Leyba on April 29, 2015, and she reported that she was

27  able to take 300 mg of gabapentin at night with improvement in her sleep and energy.  She still

28  complained of some joint pain, and did not take the Neurontin .  (AR 286.)  Overall, she felt

1   improved on the gabapentin.  (AR 286.)  Examination was unremarkable.  (AR 387.)

2       Plaintiff saw Dr. Stuart on June 2, 2015, reporting that work was less stressful, she was
3   not exercising, and the gabapentin was not overly helpful and caused dizziness.  (AR 333.)
4   Plaintiff denied any depression or anxiety.  (AR 333.)  She stated that she had insomnia and
5   headaches but they were improved.  (AR 333.)  Examination was unremarkable and Plaintiff was
6   diagnosed with hirsutism, hypertension, depression, and fibromyalgia.  (AR 334.)  She was to
7   discontinue the gabapentin, declined "SSRI" and was to begin modest exercise.  (AR 334.)

8       Plaintiff saw Dr. Stuart on June 2, 2015, complaining of shoulder pain that had started in
9   the past seven days.  (AR 329.)  Other than a tender lateral aspect of the right shoulder,
10  examination was unremarkable.  (AR 330.)  Plaintiff was diagnosed with shoulder pain, right and
11  prescribed Naprosyn.  (AR 330.)

12      Plaintiff saw Dr. Stuart on July 13, 2015, and reported that she had taken the medication
13  for three to four days and felt better so she discontinued it.  (AR 326.)  Her shoulder was a little
14  sore that day, 1 out of 10, but she was able to move it and dress herself. (AR 326.)  She reported
15  that her fibromyalgia caused her to feel depressed and anxious.  (AR 326.)  She was using
16  gabapentin to help her sleep and was not sleeping as soundly before she began using the
17  gabapentin.  (AR 326.)  Examination was unremarkable other than mildly positive supra and
18  infraspinatus tests.  (AR 326.)  Plaintiff was diagnosed with shoulder pain, right.  (AR 327.)

19      On September 14, 2015, Plaintiff saw Dr. Stuart complaining of diffuse pain all over her
20  body that was not well controlled and right heel pain.  (AR 322.)  She denied depression, anxiety
21  or insomnia.  (AR 322.)  She also reported that she had cut back to four days a week due to
22  difficulty with focus.  (AR 322.)  Other than a very tender right Achilles insertion, examination
23  was unremarkable.  (AR 322.)  Plaintiff was diagnosed with fibromyalgia and Achilles tendinitis
24  of the right lower extremity.  (AR 323.)  She was prescribed duloxetine and was to continue her
25  gabapentin.  (AR 323.)  The history notes some accompanying depression that comes and goes
26  and her feelings were injured by a supervisor who made fun of her.  (AR 323.)

27      Plaintiff saw Dr. Stuart on October 15, 2015, and reported that she had seen Dr. Glacier
28  and an x-ray showed that she had a heel spur in her right foot.  (AR 318.)  She complained that

her brain fog was worse and her memory was not as good as it used to be.  (AR 318.)  She was having a problem remembering words when she was speaking.  (AR 318.)  She tried the Cymbalta that had been prescribed one night by the next morning was very nauseous.  (AR 318.)  She reported some fatigue and tiredness getting ready for work, having problems with increased diarrhea since having her gallbladder taken out the prior year, muscle pain that moves around her body, dizziness on and off for the last couple weeks and depression on and off.  (AR 318.)  Examination notes that Plaintiff was talking very slowly and looking sad with a downcast demeanor.  (AR 318.)  She was walking with a limp, but otherwise examination was unremarkable.  (AR 319.)  Plaintiff was diagnosed with depression, fibromyalgia, and a right heel spur.  (AR 319.)  Cymbalta was discontinued and Plaintiff was prescribed Lyrica.  (AR 319.)

On November 9, 2015, Plaintiff saw Dr. Stuart complaining of a hoarse voice and body aches.  (AR 315.)  She had a sore throat for four days and it hurt to swallow.  (AR 315.)  Other than throat findings, examination was unremarkable and she was diagnosed with pharyngitis.  (AR 315.)

On November 17, 2015, Plaintiff was seen complaining that the left side of her face felt numb and droopy, and her left eye was a little blurred.  (AR 312.)  It had started suddenly three days prior.  (AR 312.)  Plaintiff was unable to fully close her left eye and she had some weakness in the facial muscles.  (AR 312.)  Examination was otherwise unremarkable and Plaintiff was diagnosed with Bell's palsy.  (AR 312.)

On November 30, 2015, Plaintiff was seen by a chiropractor, Dr. Schroeder.  (AR 418.)  She was noted to have difficulty remembering events and time sequences and was speaking very slowly and hesitantly.  (AR 418.)  Plaintiff had positive cubital , median and ulnar compression tests on the left side.  (AR 418.)  She had full range of motion in the bilateral writs, fingers, and elbows.  (AR 418.)  There was diminished sensation along the ulnar and median aspects of the left forearm.  (AR 418.)  Muscle testing of the shoulder, wrists, and digits was 4+/5 on the left and 5-/5 on the right.  (AR 419.)  Reflexes were 1+ bilaterally.  (AR 419.)  The recommendation was for another NCV/EMG study of the upper extremities.  (AR 419.)

1     Plaintiff saw Dr. Stuart on January 7, 2016, complaining of body aches and trouble

2  sleeping and that she had missed work all week.  (AR 308.)  On examination Plaintiff was tender

3  in the shoulder and hip girdle with normal range of motion.  (AR 308.)  Her Bell's palsy signs

4  had resolved.  (AR 309.)

5     Plaintiff saw Dr. Stuart again on January 14, 2016, reporting myalgias that had improved

6  and joint pain although not persistent.  (AR 305.)  She had not been to work for two weeks.  (AR

7  305.)  She had an unremarkable examination.  (AR 305.)

8     Plaintiff saw Dr. Stuart on February 5, 2016, complaining she was unable to work due to

9  fatigue and myalgias.  (AR 301.)  Dr. Stuart reviewed Dr. Leyva's report and the Lyme titer had

10  been repeated and was reported as normal.  (AR 301.)  Examination was normal.  (AR 301-302.)

11     On April 8, 2016, Plaintiff had a psychological evaluation by Dr. Murphy.  (AR 431-

12  435.)  Plaintiff ambulated without aid or assistance and her motor activity was unremarkable.

13  (AR 431.)  She did not appear to be in acute distress and her clothing was clean and neat and her

14  overall hygiene and grooming were appropriate for the setting.  (AR 431.)  Plaintiff participated

15  in a clinical interview and clinical testing session that lasted approximately 2 hours.  (AR 432.)

16  Her attention was within normal limits and she was oriented to person, place, time, and purpose

17  for the interview.  (AR 432.)  Her memory appeared to be intact for short term and remote recall.

18  (AR 432.)  Her eye contact was good and her facial expressions was responsive.  She was

19  friendly and cooperative.  (AR 432.)  She described her mood as "okay" and her emotional

20  expression was congruent to her reported mood.  (AR 432.)  Her flow of speech was normal for

21  rate, rhythm. tone, and articulation.  (AR 432.)

22     Plaintiff's thoughts were clear, coherent, well organized, goal directed, and relevant to

23  the subject at hand.  (AR 432.)  She was able to handle ideas well, and could identify basic

24  similarities, differences, and absurdities.  (AR 432.)  She denied experiencing any auditory,

25  visual, olfactory, tactile, or gustatory, hallucinations and none were observed.  (AR 432.)  She

26  did not endorse any delusional material during the interview and her insight, judgment, and

27  motivation were appropriate as was represented by her ability to keep the appointment in a

28  timely fashion and her effort in the performance of the requested testing tasks.  (AR 432.)

Plaintiff's general fund of knowledge was adequate.  (AR 432.)  She was able to name the months and seasons of the year.  (AR 432.)  She was able to name the days of the week, when asked to name the current president and two former presidents she was able to so.  (AR 432.)  She was unable to correctly name the Governor of California but knew the name the State Capital of California and the number of states that make up the United States, and she was able to discuss current events.  (AR 432.)

Dr. Murphy opined that Plaintiff does not have restrictions concerning daily activities; does not have difficulty maintaining social functioning; does not have problems with concentration, persistence and pace that could jeopardize her ability to work; will not experience episodes of emotional deterioration in work like situations; is capable to understand, carry out, and remember simple instructions; will respond adequately to co-workers, supervisors and the public; would not have difficulty responding appropriately to usual work situations; would not have difficulty dealing appropriately with changes in routine work settings; and does not have other limitations due to mental impairment.  (AR 434.)

Dr. Murphy found that there are no psychological barriers to Plaintiff entering the workforce and she is capable of performing Simple Repetitive Tasks (SRT) and complex tasks on a regular basis.  (AR 434.)  She was assessed with a Global Assessment of Function ("GAF") Score[4] of 70.[5]  (AR 434.)  He noted that Plaintiff appears to be coping well in her life.  (AR 434.)

> At the present time her level of functioning appears to be at the same level that it has been in her past life.  This claimant was smiling most of the time and appeared to be content and pleasant in her behavior.  She appears to have the ability to handle everyday activities of daily living: such as bathing, eating meals, and socializing.  Her appearance indicated that she has the ability to attend to details.
>
> She understood what was asked of her concerning the various tasks during the mental status evaluation and testing.  She did not demonstrate any difficulties understanding the simple instructions of the various tasks, confidentiality, and

---

[4] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed. 2000)).

[5] A GAF score of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning. Macias v. Colvin, No. 1:15-CV-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016).

> reason for the evaluation.  There were no psychiatric impairments were [sic] noted but she did endorse psychiatric problems in her history.  She appeared to understand and follow simple, basic instructions, and was able to complete tasks assigned to her by this clinician without difficulty.  She does not require assistance in terms of handling her own money if she were to be granted benefits.

(AR 435.)

Plaintiff saw Dr. Stuart on May 24, 2016, reporting that she was on temporary disability and wanted Dr. Stuart to extend it to the end of the year.  (AR 442.)  She reported that she was trying to get on SSDI.  (AR 442.)  She reported feeling low and had overdid it on housework the prior day.  (AR 4432.)  Examination was unremarkable other than a worried affect, anxious.  (AR 443.)

On May 31, 2016, Plaintiff had a complete internal medicine evaluation by Dr. Rush.  (AR 453-457.)  Dr. Rush obtained history from Plaintiff who was felt to be reliable.  (AR 454.)  She reported that she is fairly active: walking her dog; does some walking, does housework, cooking, and cleaning.  (AR 454.)  She reported that she does not sleep well because of hip pain.  (AR 454.)  She drives without difficulty.  (AR 454.)  Plaintiff was cooperative and in no distress.  (AR 454.)

Musculoskeletal examination of cervical spine, shoulder joints, elbow joints, and wrist joints were within normal limits bilaterally.  (AR 454.)  Hand examination was within normal limits bilaterally.  (AR 454.)  Plaintiff was able to extend the hand and oppose the thumb to each finger and make a fist without difficulty.  (AR 454.)

Dr. Rush found no evidence of tenderness in the dorsolumbar spine and range of motion was within normal limits.  (AR 455.)  Straight leg raising test was negative bilaterally.  (AR 455.)  Hip joints were within normal limits bilaterally  (AR 455.)

Knee joint, ankle joint, and foot range of motion was normal bilaterally.  (AR 456.)  There are no joint deformities, crepitus, effusion, tender or trigger points.  (AR 456.)  Motor Strength was 5/5 in the upper and lower extremities bilaterally with normal muscle bulk and tone.  (AR 456.)  Hand grip strength was normal bilaterally.  (AR 456.)  Sensory exam was normal and reflexes were normal and equal bilaterally.  (AR 456.)

Plaintiff was able to walk without difficulty, was able to walk on her toes and heels.  (AR

1   456.)  Romberg was normal.  (AR 456.)  Alternating hand movements and finger to nose was

2   normal.  (AR 456.)  Plaintiff did not use an assistive device.  (AR 456.)

3       Plaintiff was diagnosed with 1) Fibromyalgia after Lyme disease, however, she has no

4   orthopedic limitations, no redness, swelling, or deformities of any joints and excellent grip in

5   both hands with normal range of motion of the lumbar spine and she walks normally; 2)

6   Hypertension, good control; and 3) Overweight, moderate.  (AR 456.)

7       Dr. Rush opined that Plaintiff had no restrictions in pushing, pulling, lifting and carrying;

8   walking, standing or sitting.  (AR 457.)  Plaintiff can do routine bending, kneeling, stooping,

9   crawling, and crouching.  (AR 457.)  She could walk on uneven terrain, climb ladders, and work

10  at heights.  (AR 457.)  She had no restrictions in hearing and seeing.  (AR 457.)  She had no

11  restrictions in the use of the hands for fine and gross manipulative movements.  (AR 457.)

12      Plaintiff saw Dr. Stuart on September 13, 2016, reporting that she wanted her disability

13  extended to December.  (AR 523.)  Physical examination was unremarkable.  (AR 523.)

14      Plaintiff saw Dr. Stuart on December 22, 2016 complaining of pain in her hips and

15  shoulders.  (AR 663.)  Physical examination was unremarkable other than tenderness palpated in

16  the muscles and on the posterior aspect of the deltoids.  (AR 663.)  She was encouraged to do

17  moderate exercise for her fibromyalgia.  (AR 663.)

18      Plaintiff saw Dr. Mariano on July 3, 2017, to establish care.  (AR 649.)  She reported that

19  she was taking Gabapentin and Ibuprofen for her fibromyalgia.  (AR 649.)  She stated that she

20  aches all the time, but is used to the pain.  (AR 649.)  She also reported insomnia and that she

21  wanted to get on disability because of her body pains.  (AR 649.)  She reported problems

22  remembering things for many years.  (AR 649.)  Physical examination noted multiple trigger

23  point tenderness and that she claimed the pain after palpation lingered on.  (AR 650.)  Otherwise

24  examination was unremarkable and she was referred for a psychological consult due to her

25  memory loss.  (AR 650.)

26      Plaintiff saw Dr. Mariano on July 31, 2017.  (AR 639.)  Other than multiple trigger point

27  tenderness, examination was unremarkable.  (AR 639-640.)

28      On October 31, 2017, Plaintiff was seen by Dr. Tinio and reported that her blood sugars

1    were well controlled.  (AR 627.)  Other than multiple trigger point tenderness, examination was

2    unremarkable.  (AR 627-628.)

3          On this same date Plaintiff was seen by Dr. Gen who reported that Plaintiff told him she

4    had been well with no complaints.  (AR 630.)  Cognitive function was found to be normal and

5    executive function was not decreased.  (AR 630.)

6          Plaintiff saw Dr. Mariano on December 4, 2017, complaining of back pain for three days,

7    being tired, and an eye twitch.  (AR 624.)  On physical examination, Plaintiff had tenderness in

8    the lumbar area with muscle spasm.  (AR 624.)  Otherwise examination was unremarkable.  (AR

9    623-624.)

10         Plaintiff saw Dr. Tinio on December 18, 2017, and reported that her back pain was much

11   better.  (AR 613.)  Plaintiff had decreased tenderness to the lumbar area and no filling or muscle

12   spasms in the lower back.  (AR 614.)  Otherwise examination was unremarkable.  (AR 613-614.)

13         Plaintiff saw nurse practitioner Mary Stuart on February 13, 2018.  (AR 678.)  Physical

14   examination was unremarkable.  (AR 678.)

15         On February 28, 2018, Plaintiff saw Dr. Tinio complaining of a rash on her abdomen that

16   had started four days prior and hair loss.  (AR 603.)  Physical examination was unremarkable

17   other than the erythematous macerated areas.  (AR 603.)

18   **C.    ALJ Findings**

19         The ALJ made the following findings of fact and conclusions of law.

20   •      Plaintiff meets the insured status requirements of the Social Security Act through

21          December 31, 2019.

22   •      Plaintiff has not engaged in substantial gainful activity since the alleged onset

23          date of January 4, 2016.

24   •      Plaintiff has the following medically determinable impairments: carpal tunnel

25          syndrome, arthritis, and depression.

26   •      Plaintiff does not have an impairment or combination of impairments that has

27          significantly limited ( or is expected to significantly limit) the ability to perform

28          basic work related activities for 12 consecutive months; therefore, Plaintiff does

15

1    not have a severe impairment or combination of impairments.

2    •    Plaintiff has not been under a disability, as defined in the Social Security Act,

3    from January 4, 2016, through the date of this decision.

4  (AR 19-24.)

5                    **III.**

6            **LEGAL STANDARD**

7        To qualify for disability insurance benefits under the Social Security Act, the claimant

8  must show that she is unable "to engage in any substantial gainful activity by reason of any

9  medically determinable physical or mental impairment which can be expected to result in death

10  or which has lasted or can be expected to last for a continuous period of not less than 12

11  months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step

12  sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. §

13  404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th

14  Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is

15  disabled are:

16       Step one: Is the claimant presently engaged in substantial gainful activity? If so,
17       the claimant is not disabled. If not, proceed to step two.

18       Step two: Is the claimant's alleged impairment sufficiently severe to limit his or
         her ability to work? If so, proceed to step three. If not, the claimant is not
19       disabled.

20       Step three: Does the claimant's impairment, or combination of impairments, meet
         or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the
21       claimant is disabled. If not, proceed to step four.

22       Step four: Does the claimant possess the residual functional capacity ("RFC") to
         perform his or her past relevant work? If so, the claimant is not disabled. If not,
23       proceed to step five.

24       Step five: Does the claimant's RFC, when considered with the claimant's age,
         education, and work experience, allow him or her to adjust to other work that
25       exists in significant numbers in the national economy? If so, the claimant is not
         disabled. If not, the claimant is disabled.

26  Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

27        Congress has provided that an individual may obtain judicial review of any final decision

28  of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g).

1    In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

2 Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

3 disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v.

4 Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a

5 scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

6 (internal quotations and citations omitted). "Substantial evidence is relevant evidence which,

7 considering the record as a whole, a reasonable person might accept as adequate to support a

8 conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

9 Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

10    "[A] reviewing court must consider the entire record as a whole and may not affirm

11 simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting

12 Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not

13 this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

14 for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

15 susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

16 upheld.").

17 **IV.**

18 **DISCUSSION AND ANALYSIS**

19    Plaintiff contends that the ALJ erred by concluding at step two that Plaintiff's

20 fibromyalgia is not a medically determinable, severe impairment; by failing to provide specific

21 and legitimate reasons to reject the opinion of Dr. Stuart; by failing to offer any reasons for

22 rejecting Plaintiff's subjective complaints and not including work related limitations consistent

23 with the nature and intensity of her limitations; and by failing to properly evaluate the testimony

24 of her husband, Tim Jones.

25    **A.**   **Step Two**

26    Plaintiff contends that the ALJ erred at step two by concluding that Plaintiff's

27 fibromyalgia is not a medically determinable, severe impairment. Plaintiff argues that the

28 medical evidence of record does in fact satisfy diagnostic criteria and the ALJ's conclusion that

1   it does not is contracted by the facts.  In fact, Plaintiff asserts that she meets the criteria under

2   both the 1990 College of Rheumatology Criteria and the 2010 ACR Preliminary Diagnostic

3   Criteria.

4          Defendant does not address Plaintiff's argument that the ALJ erred by finding her

5   fibromyalgia not severe, but counters that any perceived error is harmless because the ALJ

6   reasonably concluded that Plaintiff did not have any impairments that would significantly limit

7   her ability to perform basic work activities and reasonable concluded that her impairments were

8   not severe and denied her claim on that basis.  Defendant argues that Plaintiff has failed to

9   demonstrate that her fibromyalgia was severe at step two.

10         "An impairment or combination of impairments can be found 'not severe' only if the

11  evidence establishes a slight abnormality that has 'no more than a minimal effect on an

12  individual['s] ability to work.' "  Smolen, 80 F.3d at 1290 (citations omitted).  Step two is a "de

13  minimis screening devise to dispose of groundless claims."  Id.  An ALJ can only find that

14  claimant's impairments or combination of impairments are not severe when his conclusion is

15  clearly established by medical evidence.  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005)

16  (quoting S.S.R. 85-28).  In considering an impairment or combination of impairments, the ALJ

17  must consider the claimant's subjective symptoms in determining their severity.  Smolen, 80

18  F.3d at 1290.

19         Symptoms are not medically determinable physical impairments and cannot by

20  themselves establish the existence of an impairment.  Titles II & XVI: Symptoms, Medically

21  Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR

22  96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs

23  and laboratory findings demonstrating the existence of a medically determinable ailment.  Id.

24  "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's

25  complaints may appear to be, the existence of a medically determinable physical or mental

26  impairment cannot be established in the absence of objective medical abnormalities; i.e., medical

27  signs and laboratory findings .... In claims in which there are no medical signs or laboratory

28  findings to substantiate the existence of a medically determinable physical or mental impairment,

1   the individual must be found not disabled at step 2 of the sequential evaluation process." Id.

2        At step two, the ALJ first found that Plaintiff had medically determinable impairments of

3   carpal tunnel syndrome, arthritis, and depression.   (AR 19.)   The finding that Plaintiff's

4   fibromyalgia was not a medically determinable impairment is stated as follows.

5        Pursuant to Social Security Ruling 12-2p, fibromyalgia can be generally be found
to be a medically determinable impairment if there is evidence that shows a
6   licensed physician conducted a physical exam and reviewed the person's medical
history and diagnosed the claimant with fibromyalgia.  The physician treatment
7   notes are reviewed to see if they are consistent with fibromyalgia and to evaluate
the nature of the claimant's symptoms over time, in part because the physician's
8   diagnosis alone is not enough to establish fibromyalgia.

9        There are two specific sets of criteria that can establish that a person has a MDI of
fibromyalgia.   One is based on the 1990 American College of Rheumatology
10  (ACR) Criteria for the Classification of Fibromyalgia; the other derives from the
2010 ACR Preliminary Diagnostic Criteria.   Under the 1990 ACR criteria, a
11  person must have: (1) a history of widespread pain; (2) at last 11 positive tender
points on physical examination; and (3) evidence that other disorders that could
12  cause the signs or symptoms have been excluded.  Alternatively, based on the
2010 ACR criteria, a claimant can be found to have fibromyalgia if he or she has:
13  (1) a history of widespread pain; (2) repeated manifestations of six or more
fibromyalgia symptoms, signs, or conditions, especially fatigue, cognitive or
14  memory problems, waking unrefreshed, depression, anxiety disorder, or irritable
bowel syndrome; and (3) evidence that other disorders that could have caused
15  these repeated manifestations of symptoms have been excluded (SSR 12-2p).

16       I find the claimant does not have a medically determinable impairment pursuant
to the 2010 ACR criteria.  Although the claimant's medical record endorses a
17  history of fibromyalgia, there was no indication that other signs and symptoms
have been excluded and the findings are insufficient to establish a diagnosis under
18  SSR12-2p.

19  (AR 20-21.)

20      1.    1990 College of Rheumatology Criteria

21       Plaintiff argues that the 1990 College of Rheumatology Criteria requires two prongs: "1.

22  A history of widespread pain in all quadrants of the body that has persisted for at least three

23  months; and, 2. At least 11 positive tender points on physical examination, that are present

24  bilaterally and both above and below the waist."  (Mot. at 8.)  Plaintiff contends that record

25  demonstrates a history of widespread pain all over her body for which she has been prescribed

26  medication.  Plaintiff also argues that the record demonstrates that she had multiple trigger point

27  tenderness.

28       Pursuant to the 1990 American College of Rheumatology Criteria for the Classification

of Fibromyalgia, "a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may "fluctuate in intensity and may not always be present"); (2) she has tenderness in at least eleven of eighteen specified points on her body; and (3) there is evidence that other disorders are not accounting for the pain." Revels v. Berryhill, 874 F.3d 648, 656–57 (9th Cir. 2017).

> At least 11 positive tender points on physical examination. . . .
>
> The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.
> a. The 18 tender point sites are located on each side of the body at the:
> • Occiput (base of the skull);
> • Low cervical spine (back and side of the neck);
> • Trapezius muscle (shoulder);
> • Supraspinatus muscle (near the shoulder blade);
> • Second rib (top of the rib cage near the sternum or breast bone);
> • Lateral epicondyle (outer aspect of the elbow);
> • Gluteal (top of the buttock);
> • Greater trochanter (below the hip); and
> • Inner aspect of the knee.

Soc. Sec. Ruling, SSR 12-2p; Titles II & Xvi: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012).

Plaintiff points to the following records arguing they establish the basis for fibromyalgia under the 1990 College of Rheumatology Criteria.

On January 7, 2016, Plaintiff saw Dr. Stuart complaining of body aches, trouble sleeping and having missed work all week.  (AR 308.)  Plaintiff reported persistent myalgia, especially in the hips and shoulders and that her pain was interfering with her sleep.  (AR 308.)  Musculoskeletal examination notes no edema and that she was tender in the shoulder and hip girdle.  (AR 308.)

On December 22, 2016, Plaintiff saw Dr. Stuart reporting increasing difficulty with the pains in her shoulders and hips that she thought was due to the cold weather.  (AR 667.)  She also reported increased morning stiffness.  (AR 667.)  Musculoskeletal examination shows tenderness palpated in muscles and on the posterior aspect of the deltoids.  (AR 667.)

On July 3, 2017, Plaintiff had an appointment with Dr. Mariano to establish care.  (AR 649.)  She was taking Gabapentin and ibuprofen and complained that she ached all the time and

1    was having insomnia.  (AR 649.)  She reported problems with remembering things for many

2    years.  (AR 649.)  She also stated that she had been previously diagnosed with Lyme disease but

3    was later diagnosed with fibromyalgia.  (AR 649.)  Musculoskeletal examination notes multiple

4    trigger point tenderness and that she claimed that the pain after palpation lingered on.  (AR 650.)

5         On July 31, 2017, Plaintiff was seen by Dr. Mariano for a follow up.  (AR 639.)  She

6    complained of eye redness with burning pain and tearing and suggested that her allergies were

7    acting up again.  (AR 639.)  She also complained of hypoglycemic symptoms when she missed a

8    meal that improved when she ate.  (AR 639.)  Musculoskeletal examination notes multiple

9    trigger point tenderness.  (AR 640.)

10        Here, the ALJ reasonably could conclude that the 1990 American College of

11   Rheumatology Criteria was not met because the record does not demonstrate that Plaintiff has

12   "tenderness in at least eleven of eighteen specified points on her body."  Rather, the evidence

13   cited to by Plaintiff indicates that Plaintiff has tender points in her shoulders and hips.  The ALJ

14   did not err in finding that Plaintiff did not meet the 1990 American College of Rheumatology

15   Criteria.

16        2.    2010 ACR Preliminary Diagnostic Criteria

17        Plaintiff argues that ALJ erred by finding that she did not meet the 2010 ACR

18   Preliminary Diagnostic Criteria.

19        Under the 2010 ACR Preliminary Diagnostic Criteria, "a person suffers from

20   fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the

21   pain may "fluctuate in intensity and may not always be present"); (2) she has experienced

22   repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring

23   conditions, "especially manifestations of fatigue, cognitive or memory problems ("fibro fog"),

24   waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"; and (3) there is

25   evidence that other disorders are not accounting for the pain."  Revels, 874 F.3d at 657.

26        Symptoms and signs that may be considered include the "(s)omatic symptoms"
         referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR
27        Preliminary Diagnostic Criteria.  We consider some of the "somatic symptoms"
         listed in Table No. 4 to be "signs" under 20 CFR 404.1528(b) and 416.928(b).
28        These "somatic symptoms" include muscle pain, irritable bowel syndrome,

fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

SSR 12-2p at n.9.

Some co-occurring conditions that may be considered are referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria as "somatic symptoms," such as irritable bowel syndrome or depression. Other co-occurring conditions, which are not listed in Table No. 4, may also be considered, such as anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome.

SSR 12-2p at n.10.

Plaintiff argues that six of the criteria have been met pointing to the following records.

A comprehensive metabolic panel was done on June 10, 2015.  (AR 349.)

On October 15, 2015, Plaintiff was seen for right foot pain.  (AR 318.)  She complained of some fatigue and tiredness, having increased diarrhea since having her gallbladder removed, muscle pain that moved around her body, dizziness off and on for the last couple weeks, depression off and on and that her memory was not as good a it used to be.  (AR 318.)  Plaintiff was found to be very slow talking and looked sad with a downcast demeanor, but otherwise physical examination was unremarkable.  (AR 318-319.)  She was diagnosed with depression, fibromyalgia, and a heel spur.  (AR 319.)  Plaintiff also cites to the record of her vital statistics for this visit.  (AR 552.)

On January 7, 2016, Plaintiff complained of persistent myalgias especially in the hips and shoulders associated with work stress and being unable to go to work.  (AR 308.)  She said that she was unable to go to work, pain was interfering with her sleep, her energy was low, she was very stiff in the a.m., and was getting down because she was afraid of losing her job.  (AR 308.)  She was found to have tenderness in her shoulder and hip girdle.  (AR 308.)  A c-reactive protein and sedimentation rate were performed.  (AR 309.)

Plaintiff was seen on January 14, 2016 complaining of myalgias that had improved and

1    joint pain, but no persistent joint pain.  She reported depression that comes and goes, insomnia
2    and pain primarily in her hips and low back.  (AR 305.)  Examination was unremarkable and she
3    was diagnosed with fibromyalgia.  (AR 305.)  Labs were reviewed on evidence "PMR".  (AR
4    305.)

5        On May 24, 2016, Plaintiff was seen for a follow up and complained that she could not
6    drive because she was too nervous, she was having headaches on and off and trouble
7    concentrating and remembering, that her right shoulder was hurting, and was not sleeping well
8    unless she took medication, that she was feeling low, and overdid it on housework the prior day.
9    (AR 442.)  Plaintiff had a worried affect and was anxious.  (AR 443.)  She was diagnosed with
10   fibromyalgia, anxiety, depression, essential hypertension, and hirsutism.  (AR 443.)

11       On September 13, 2016, Plaintiff was seen and complained that she would be feeling
12   okay for a while and then it would hit her like a tone of bricks and she would have to go lie
13   down, always having pain in her hips and lower back, being clumsy and sometimes feeling
14   dizzy, getting depressed sometimes because of what she was not able to do, and not being able to
15   sleep very well without gabapentin.  (AR 552.)  She had an unremarkable physical examination
16   and was diagnosed with fibromyalgia, anxiety, hirsutism, and essential hypertension.  (AR 523.)

17       On February 13, 2018, Plaintiff was seen complaining of headaches, muscle pain, joint
18   pain, being tired all the time, and brain fog that made it hard to concentrate, bad memory, and
19   forgetting things.  (AR 678.)  Plaintiff had an unremarkable examination and lab results were
20   reviewed.  (AR 679.)  She was diagnosed with fibromyalgia.  (AR 679.)

21       The record demonstrates that Plaintiff has endorsed at least six of the symptoms that
22   would meet the criteria for the 2010 ACR Preliminary Diagnostic Criteria.

23       Plaintiff contends that the ALJ erred by finding that there was no indication that other
24   signs and symptoms have been excluded pointing to testing for Lyme disease and C-reactive
25   protein and ESR and when the test results were normal her doctor diagnosed her with
26   fibromyalgia.  Plaintiff argues that the diagnostic criteria has been met.  There is evidence in the
27   record that other diagnoses were ruled out.  (AR 290, 301, 305, 309, 679.)

28       Accordingly, the ALJ erred by finding that there was no indication that other signs and

1 | symptoms have been excluded.

2 |       3.    <u>Whether the Error Was Harmless</u>

3 |       The Commissioner contends that any error was harmless because Plaintiff has failed to

4 | show that her medically determinable impairments were severe within the meaning of the

5 | regulations.  Further, the Commissioner argues that there is insufficient evidence to find a severe

6 | impairment and since Plaintiff did not meet her burden to show that she had a severe impairment

7 | remanding for further evaluation would not change the analysis.

8 |       The harmless error rule applies in Social Security cases.  <u>Molina v. Astrue</u>, 674 F.3d

9 | 1104, 1115 (9th Cir. 2012).  ALJ's decision will not be reversed for errors that are harmless.

10 | <u>Burch</u>, 400 F.3d at 679.

11 |       At step two, the ALJ assesses the medical severity of the claimant's impairments.   20

12 | C.F.R. § 404.1520(a)(4)(ii).  A claimant must have a severe impairment and if there is not any

13 | impairment or combination of impairments which significantly limits the claimant's physical or

14 | mental ability to do basic work activities, the claimant be will be found to not have a severe

15 | impairment and he or she would not be disabled.  20 C.F.R. § 404.1520(c).  "An impairment or

16 | combination of impairments is not severe if it does not significantly limit your physical or mental

17 | ability to do basic work activities."  20 C.F.R. § 404.1522(a).

18 |       Basic work activities are "the abilities and aptitudes necessary to do most jobs."   20

19 | C.F.R § 404.1522(b).  This includes,

20 |       (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

21 |       (2) Capacities for seeing, hearing, and speaking;

22 |       (3) Understanding, carrying out, and remembering simple instructions;
      (4) Use of judgment;

23 |       (5) Responding appropriately to supervision, co-workers and usual work situations; and
      (6) Dealing with changes in a routine work setting.

24 | 20 C.F.R. § 404.1522(b).  An impairment is not severe if it is merely "a slight abnormality (or

25 | combination of slight abnormalities) that has no more than a minimal effect on the ability to do

26 | basic work activities."  <u>Webb</u>, 433 F.3d at 686 (quoting S.S.R. No. 96–3(p) (1996)).

27 |       Plaintiff argues that the ALJ's error was not harmless because if the ALJ had the

28 |

1   fibromyalgia diagnosis in front of her, it stands to reason that Plaintiff's symptoms and behavior
2   would have appeared in a different and more favorable light citing Buell v. Berryhill, 716 F.
3   App'x 600, 602 (9th Cir. 2017).  In this instance, the error in finding Plaintiff's fibromyalgia not
4   to be a medically determinable ailment cannot be found to be harmless.  Fibromyalgia "is
5   diagnosed entirely on the basis of patients' reports of pain and other symptoms."  Benecke v.
6   Barnhart, 379 F.3d 587, 590 (9th Cir. 2004).  Therefore, the ALJ might have considered
7   Plaintiff's subjective complaints differently had she had the valid diagnosis of fibromyalgia.
8   This action shall be remanded for the ALJ to continue the sequential evaluation process.

9           **B.     Dr. Stuart**

10          Plaintiff also contends that the ALJ erred rejecting the testimony of Dr. Stuart because it
11  was based on the erroneous fibromyalgia finding.  Defendant counters that Plaintiff's argument
12  is meritless because the ALJ found that Dr. Stuart's opinion was inconsistent with his own notes
13  and the subsequent record.

14          The weight to be given to medical opinions depends upon whether the opinion is
15  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d
16  821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded
17  more weight than those of non-examining physicians, and the opinions of examining non-
18  treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495
19  F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or
20  examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject
21  it by providing specific and legitimate reasons that are supported by substantial evidence."
22  Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The
23  contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific,
24  legitimate reason for rejecting a treating or examining physician's opinion, however, "it may
25  constitute substantial evidence when it is consistent with other independent evidence in the
26  record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept
27  the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.
28  Thomas, 278 F.3d at 957.  Here, Dr. Stuart's opinion is contradicted by the opinion of Dr.

Murphy, so the ALJ needed to provide specific and legitimate reasons to provide lesser weight to the opinion.  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen , 779 F.2d 1403, 1408 (9th Cir. 1989)).

The ALJ considered that on July 2, 2015, Plaintiff reported right shoulder pain caused by an overuse injury at work.  (AR 22, 329.)  Other than a tender lateral aspect of the right shoulder, examination was unremarkable.  (AR 329-330.)  However, on July 13, 2015, she returned for a follow up and indicated that she only took the medication for three to four days and then discontinued it because she felt better.  (AR 22, 326.)  She reported that her shoulder only hurt with certain movements and described her pain as 1/10.  (AR 326.)

On January 7, 2016, Plaintiff presented with myalgias especially in the hips and shoulders.  (AR 22, 537.)  On examination, she was found to be tender in the shoulder and in the hip girdle, but she had normal range of motion and no joint swelling.  (AR 22, 537-538.)  She was advised to take Gabapentin as needed and was started on prednisone.  (AR 22, 538.)  Plaintiff had a follow up visit on January 14, 2016, and indicated that she had improved.  (AR 22, 305.)  Examination was unremarkable.  (AR 305.)

In March 2016 Plaintiff was reevaluated for her hand pain and assessed with fibromyalgia and left carpal tunnel.  (AR 22, 364.)  It was noted that she did not have right carpal tunnel and had already reached medical improvement.  (AR 22, 364.)

At a visit on May 2016, Plaintiff stated she could not drive anymore because she was too nervous and she reported having headaches on and off.  (AR 22, 526.)  However, she indicated that her health is okay other than her fibromyalgia.  (AR 22, 526.)  Other than a worked affect and anxiety, examination was unremarkable.  (AR 527.)

On September 13, 2106, Plaintiff saw Dr. Stuart requesting a permanent disability placard for her car.  (AR 22, 522.)  Physical examination was within normal limits.  (AR 22, 522-523.)

On December 22, 2016, Plaintiff was seen and had tenderness palpated in her muscles,

but examination was otherwise normal.  (AR 22, 703-704.)  In a follow up visit on October 31, 2017, Plaintiff stated that she had been well with no complaints and denied limiting pain, leg pain, shortness of breath, dizziness or syncope.  (AR 22, 627-628.)  A treadmill test taken earlier that month was negative for ischemia.  (AR 22, 631.)

On July 3, 2017, Plaintiff had multiple trigger point tenderness on examination and she claimed that the pain lingered after palpation.  (AR 22, 650.)

On December 4, 2017, the notes reported that she was using a cane for walking due to a sudden onset of back pain.  (AR 22, 623.)  Other than lumbar tenderness, examination was unremarkable.  (AR 22, 623-624.)  Plaintiff was seen again on December 18, 2017, and reported that her back pain had resolved with cyclobenzaprine.  (AR 22, 613.)

The ALJ found that a progress note on February 13, 2018, showed that she requested a letter for work concerning fibromyalgia, but there was no examination, no reported symptoms, and no observations.  (AR 22, 678-679.)  However, there was a physical examination that was unremarkable.  (AR 678-679.)

On February 28, 2018, Plaintiff presented complaining of hair loss and a rash, however the ALJ found that objective findings were notable for no acute distress.  (AR 22, 603.)

The ALJ also considered the mental evidence in the record.  (AR 22.)  During an office visit on October 15, 2015, Plaintiff's mood was down and she spoke slowly.  (AR 22, 319.)  On February 5, 2016, Plaintiff was noted to have a normal mood and affect.  (AR 22, 302.)

Plaintiff was seen on September 13, 2016 and reported that she sometimes gets depressed because she cannot do the things that she used to do.  (AR 22, 522.)  On examination, she displayed normal mood and affect, normal behavior and judgment, and her thought content was normal.  (AR 22, 523.)

During a visit on July 3, 2017, there was a discussion based on claimant's reports, but neurological and mental status examination was within normal limits.  (AR 22, 649-650.)

A progress note from February 13, 2108, notes no mental health concerns on examination.  (AR 22, 679.)

The ALJ also considered the April 8, 2016 consultative examination of Dr. Murphy who

1  opined that Plaintiff had no psychological barriers to entering the workforce and that she was

2  capable of performing simple and repetitive tasks on a regular basis.  (AR 23, 431-435.)

3       The ALJ considered a letter submitted by Dr. Stuart on April 12, 2018.  (AR 23.)  Dr.

4  Stuart stated that Plaintiff had major health issues associated with fibromyalgia, and her

5  symptoms included polymyoarthralgia, fatigue, lack of energy, poor sleep, poor memory, and

6  cognitive dysfunction, which have been prevalent and progressive over 20 years.  (AR 23, 712.)

7  Dr. Stuart indicated that Plaintiff's constant pain, poor sleep and lack of energy led to

8  absenteeism, and her cognitive dysfunction led to poor work performance, criticism, and even

9  ridicule by her supervisors and coworkers.   (AR 23, 712.)  Dr. Stuart noted that Plaintiff's

10 symptomology caused to her feeling unsafe in driving.  (AR 23, 712.)  He stated that "he would

11 advocate for total disability particularly considering the progressive cognitive dysfunction."  (AR

12 23, 713.)  The ALJ gave Dr. Stuart's opinion little weight finding it inconsistent with his own

13 treatment records and other providers, which do not have testing to support cognitive and

14 physical limitations at the majority of visits.  (AR 23.)

15      The ALJ could reasonably find that Dr. Stuart's opinion was inconsistent with his own

16 treatment notes and those of the other providers in the record.  Although Dr. Stuart stated that

17 Plaintiff had cognitive dysfunction and advocated for total disability based on "progressive

18 cognitive disfunction" his own records do not support that Plaintiff had cognitive disfunction.

19 There are a few instances in the record where Plaintiff is noted to have some type of issue

20 functioning as the ALJ noted.  For example in 2014, Plaintiff had slow mental functioning, was

21 unable to do serial sevens, slow backwards spelling, but she was able to remember three objects.

22 (AR 475.)   But she also reported that she felt mentally capable of doing the job but was

23 overwhelmed by the workload and was having conflicts with her boss.  (AR 475.)  There is an

24 occasion on October 15, 2015, that Plaintiff was noted to be very down and speaking slowly.

25 (AR 319.)   Also, on November 30, 2015, Plaintiff's chiropractor noted that she was having

26 difficulty remembering events and time sequences and speaking slowly.  (AR 312.)  During this

27 time period she had been diagnosed with Bell's palsy.  (AR 312.)  Her Bell's palsy was resolved

28 at a follow up on January 14, 2016, and Plaintiff had a normal psychological findings.  (AR 309.)

1    Overall, the record after 2015 largely demonstrates normal mental status examinations.  (AR

2    312, 315, 322, 326, 330, 334, 337, 341, 462, 468, 472, 478, 482, 487, 490, 589, 594, 598.)

3         The later record similarly continues to demonstrate normal psychological findings.  (AR

4    302, 305.)  In April 2016, Dr. Murphy found that Plaintiff's mental functioning was at the same

5    level it had been in her past life and found no psychological barriers to entering the workforce

6    and was able to perform simple repetitive as well as complex tasks on a regular basis.  (AR 435.)

7    While Dr. Stuart noted a worried affect and that Plaintiff was anxious on May 24, 2016, there are

8    no objective findings that Plaintiff was impaired in her functioning.  (AR 443.)  Plaintiff was

9    noted to be alert and oriented with normal judgment.  (AR 443.)  The later records continue to

10   reflect normal psychological findings.  (AR 523, 663.)  On July 3, 2017, Plaintiff was referred

11   for a psychological consult due to her complaints of memory loss, the notes for that date reflect

12   that psychological examination was normal; Plaintiff was alert, oriented, cooperative with exam,

13   had good eye contact, judgement and insight, and her speech was clear.  (AR 650.)  Subsequent

14   examinations continued to reflect similar findings or no psychological findings.  (AR 614, 624,

15   628, 640.)  On August 28, 2017, Dr. Gen found that Plaintiff's cognitive functioning was normal

16   and executive functions were not decreased.  (AR 637.) Substantial evidence in the record

17   supports the ALJ's finding that Dr. Stuart's opinion was not consistent with the medical record.

18   A conflict between treatment notes and the treating provider's opinion may constitute a specific

19   and legitimate reason to discredit the opinion of the treating physician or another treating

20   provider.  Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014); Molina, 674 F.3d at 1111–12.

21        The ALJ provided a specific and legitimate reason to reject Dr. Stuart's April 12, 2018

22   opinion.

23   **C.    Credibility Findings**

24        Plaintiff argues that the ALJ erred in finding her and her spouse's testimony to not be

25   credible.  Since this matter is being remanded due to the ALJ failing to find that her fibromyalgia

26   was severe which may affect the credibility determination, the Court declines to further address

27   finding that Plaintiff's subjective complaints were not credible.

28        As to the lay witness testimony, "[i]n determining whether a claimant is disabled, an ALJ

1  must consider lay witness testimony concerning a claimant's ability to work." Stout, 454 F.3d at

2  1053.  "Lay witness testimony is competent evidence and cannot be disregarded without

3  comment."  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Nguyen v. Chater,

4  100 F.3d 1462, 1467 (9th Cir. 1996)).  The ALJ must give specific reasons germane to the

5  witness in discounting the lay witness testimony.  Stout, 454 F.3d at 1056.  Where the ALJ gives

6  reasons for rejecting the claimant's testimony that are equally relevant to similar testimony

7  provided by lay witnesses, that would support a finding that the lay witness testimony is

8  similarly not credible.  Molina, 674 F.3d at 1114.  However, if the ALJ ignores lay witness

9  testimony that is highly probative of the claimant's condition, "a reviewing court cannot consider

10  the error harmless unless it can confidently conclude that no reasonable ALJ, when fully

11  crediting the testimony, could have reached a different disability determination."  Cindy F. v.

12  Berryhill, 367 F.Supp.3d 1195, 1216 (D. Or. 2019) (quoting Stout, 454 F.3d at 1056).  Since this

13  action is being remanded based on the error in determining Plaintiff's medically determinable

14  impairments, the ALJ should provide germane reasons if she rejects Mr. Jones' testimony.

15                                            **V.**

16                          **CONCLUSION AND ORDER**

17         Based on the foregoing, the Court finds that the ALJ erred in determining that Plaintiff's

18  fibromyalgia was not severe and failing to proceed with the sequential evaluation.  Accordingly,

19  IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of

20  Social Security is GRANTED and this matter is remanded back to the Commissioner of Social

21  Security for further proceedings consistent with this order.  It is FURTHER ORDERED that

22  judgment be entered in favor of Plaintiff Nicole Jones and against Defendant Commissioner of

23  Social Security.  The Clerk of the Court is directed to CLOSE this action.

24

25  IT IS SO ORDERED.

26  Dated:  **February 4, 2021**                    _____

27                                                  UNITED STATES MAGISTRATE JUDGE

28